**NORTHERN HEALTH FACILITIES, INC, D/B/A Greenbelt Nursing and Rehabilitation Center Plaintiff,**

v.

**UNITED STATES of America, et. al., Defendants.**

**No. CIV.A. AW 98–4006.**

United States District Court,
D. Maryland,
Southern Division.

Dec. 28, 1998.

Kimberly Nichelson Tarver, Washington, DC, Howard L. Sollins, Baltimore, MD, for plaintiff.

Philip D. Bartz, Sheila M. Lieber, Martha Hirchfield, Washington, DC, for defendant U.S.

Margaret Ann Nolan, Elizabeth M. Kameen, Baltimore, MD, for defendant State of Maryland.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

### I

Currently pending before the Court is Plaintiff's Motion for a Temporary Restraining Order. The Court has considered the motion, the opposition thereto, and the entire record, including the testimony presented by witnesses and the arguments made by counsel in the hearing held in open court on December 9, 1998. For the reasons that follow, the Court will deny this Motion.

### II

*Background*

Plaintiff, Northern Health Facilities, Inc., d/b/a Greenbelt Nursing and Rehabilitation Center ("Greenbelt"), is a 132 bed facility, which is currently occupied by 85 residents. About 90% of Greenbelt's residents receive Medicaid benefits. Greenbelt was certified as a skilled nursing facility ("SNF") under the federal Medicare program prior to September 26, 1998. Greenbelt was also certified as a nursing facility ("NF") under the Maryland Medical Assistance Program prior to October 26, 1998.

Plaintiff asks the Court to enjoin Defendant Donna E. Shalala, Secretary of the United States Department of Health and Human Services ("HHS"), and Defendant Martin P. Wasserman, Secretary of the Maryland Department of Health and Mental Hygiene ("MDHMH") from terminating its participation and its funding under the Medicare and Medicaid programs. Plaintiff contends that the termination violates the Medicare and Medicaid Acts, and its due process rights Plaintiff further contends that "[s]uch relief is appropriate to preserve the status quo pending completion of the usual administrative process,

and to prevent irreparable injury to Greenbelt and its elderly and disabled residents." (Plaintiff's Memorandum at 2.)

The Medicare program, established pursuant to Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, is federal program designed to provide health insurance for the aged, blind, and disabled. Health Care Financing Administration ("HCFA"), an agency within HHS, oversees the implementation of this program. The Medicaid program, established pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is a joint program, funded by both the federal and state government, designed to provide medical assistance to certain persons in need. HCFA has a supervisory role over the state agencies which implement the Medicaid program. In Maryland, the MDHMH is the agency which implements the program.

The Medicare and Medicaid programs both reimburse nursing facilities for certain services provided to their residents. To qualify for reimbursement, a facility must be certified to participate in the programs. To be certified under the Medicare program, a facility must be in "substantial compliance" with various requirements set forth in 42 U.S.C. § 1395i–3(b)-(d), and in the federal regulations found in 42 C.F.R. § 483.1 *et seq.* To be certified under the Medicaid program, a facility must be in "substantial compliance" with various requirements set forth in 42 U.S.C. § 1396r (b)-(d), and in the federal regulations found in 42 C.F.R. § 442.1 *et seq.* The state survey agencies typically are responsible for conducting inspections of the facilities to ensure their compliance with the participation requirements. In Maryland, the Licensing and Certification Administration ("LCA"), an agency within MDHMH, sends survey teams to make these periodic evaluations. HCFA makes the final determination as to certification in the Medicare program as it is solely a federal program. HCFA

can exercise "look behind authority," and conduct its own surveys of facilities under the joint Medicaid program.

In January of this year, LCA surveyors visited Greenbelt. Due to this survey, Greenbelt was found not to be in substantial compliance with the Medicare and Medicaid regulations as of January 26, 1998. Pursuant to the regulations, the facility submitted a plan of correction. During subsequent surveys, Greenbelt was found to still have deficiencies. After three months, pursuant to 42 U.S.C. § 1395i–3(h)(2)(D), HCFA denied payments for new admissions and imposed civil penalties. Greenbelt was advised that LCA would recommend that its provider agreement be terminated if it was not in substantial compliance by July 26, 1998. *See* Defendant Exhibit 3.

A survey was conducted in July that found Greenbelt not to be in substantial compliance. Greenbelt submitted additional evidence to LCA claiming that it was in compliance. On July 29, 1998, LCA sent a letter to Greenbelt accepting its evidence that it was in compliance. In that letter, LCA stated that it would "consider that [Greenbelt was] in compliance ... as of July 26, 1998 ... [and would] recommend[ ] to HCFA that the termination action be rescinded and that the civil money penalty and denial of payment for new admissions sanctions cease." Plaintiff's Exhibit 7. The letter also stated that HCFA would advise Greenbelt separately of its decision.

In August of 1998, the United States Attorney's Office for the District of Maryland and the Office of Inspector General for the HHS began an investigation into whether Greenbelt had violated the False Claims Act, 31 U.S.C. § 3729. On August 17, 1998 representatives from the U.S. Attorney's Office, LCA and HCFA surveyors visited the Greenbelt facility. During this visit, Greenbelt was found to not be in compliance with the Medicare and Medicaid program requirements.

As a result of the August finding, on September 11, 1998, HCFA sent a letter notifying Greenbelt that it was terminating its participation in the Medicare program on September 26, 1998. In that letter HCFA stated that:

> "On July 20, 1998, the Licensing and Certification Administration of the Maryland Department of Health and Mental Hygiene informed us that you had submitted to that state agency satisfactory evidence of correction of all the deficiencies remaining when the state agency had last revisited your facility on July 14–17, 1998. We were prepared to accept the conclusion that you had corrected all of your deficiencies, until a member of our staff and a member of the staff of the state survey agency visited your facility on August 17–18, 1998."

(Plaintiff Exhibit 9.)

The letter also stated that Greenbelt had provided evidence in its plan correction which was inaccurate. Further, HCFA noted evidence of deficiencies "that occurred prior to, during and after the July 26, 1998 date upon which you alleged substantial compliance." *Id.* The letter also stated that it concluded that Greenbelt had not "regained compliance with the Medicare/Medicaid requirements since the survey completed on January 26, 1998." *Id.* HCFA claimed its termination was based on 42 U.S.C. § 1395i–3(h)(2)(C) and 42 C.F.R. § 488.450(c) and (d), which allow the Secretary to continue to make payments to a facility which is out in compliance for a period of six months. HCFA informed Greenbelt that it had sixty days to request a hearing before an administrative law judge of the HHS, Departmental Appeals Board.[1]

On September 14, 1998, the United States through the U.S. Attorney Office

---

1. Plaintiff appealed within the sixty days provided. Since very few of its residents receive care reimbursed under Medicare Part A, Greenbelt has borne the cost of providing these services since the termination.

filed a complaint for injunctive relief on September 14, 1998. *United States v. Northern Health Facilities, Inc. d/b/a Greenbelt Nursing & Rehabilitation Center, et al.*, Civil Action No. AW 98–3113. It named Greenbelt as one of the defendants. On September 15, this Court approved a Preliminary Injunction Order ("Consent Order") which was presented to it with the consent of all parties involved. Signatory parties were the United States Attorney for the District of Maryland, on behalf of the United States of America, through two of the Assistant United States Attorneys and counsel for the Defendants. Neither the State or HCFA were signatory parties to the Consent Order. Under the Consent Order, a Temporary Manager, selected by the United States, was to be hired by Greenbelt, with the "independent authority to hire, terminate or reassign, staff, obligate facility funds, alter facility procedure, and manage the facility to correct all deficiencies identified in Greenbelt." (Consent Order at 19.) In addition, a Federal Monitor was to be appointed, to "oversee Greenbelt's compliance with th[e] Order and independently assess Greenbelt's compliance with th[e] Order." *Id.* at 20.

In one of its provisions, the Consent Order stated:

> During the duration of this action and under the terms of this Preliminary Injunction, all federal and State regulatory oversight and enforcement obligations shall remain in full effect. All administrative remedies, including the authority of the Office of Inspector General to seek exclusion and the Health Care Financing Administration and the State of Maryland to seek termination or other administrative remedies, are preserved and are not supplanted by the terms of the Preliminary Injunction . . .

(Consent Order at 3.)

On October 5, 1998, Ilene Warner was appointed to be the Temporary Manager of Greenbelt. Warner took steps to improve conditions at Greenbelt such as hiring a new medical director and a new Certified Nurse Practitioner. On November 20, 1998, Claudia Schlosberg, staff attorney at the National Health Law Program in Washington, D.C. was appointed as the Federal Monitor.

As a result of HCFA's decision to terminate Greenbelt from the Medicare program[2], the State notified Greenbelt, on October 9, 1998, that it would terminate Greenbelt as a Medicaid provider effective October 26, 1998. However, in an effort to allow Greenbelt to come into compliance under the supervision of the Temporary Manager, the State continued providing Medicaid payments until December 2, 1998. As of December 2, 1998, all funding to Greenbelt had ceased.

On November 10, Greenbelt sought administrative review of HCFA's decision to terminate it from the Medicare program. The facility also filed an application for Medicaid recertification to the Maryland Medicaid program. On November 17–19, 1998, a LCA survey of the facility took place. The LCA surveyors found that Greenbelt was still not in substantial compliance. Two weeks later, a HCFA survey team visited the facility (from November 30—December 4) and noted additional deficiencies. In all of the surveys to date, the deficiencies have never reached the highest level under the regulations which is "immediate jeopardy to resident health or safety." Most deficiencies were at the "no actual harm with potential for more than minimal harm that is not immediate jeopardy" level.

On December 7, 1998, Plaintiff brought the instant suit. Plaintiff sought a court order enjoining the Defendants from terminating its participation in the Medicare and Medicaid programs. Plaintiff argued that it may have to close due to the cessation of the payments because the majority

---

**2.** "Termination from Medicaid is automatic upon termination from Medicare." *International Long Term Care, Inc. v. Shalala,* 947 F.Supp. 15, 16 (D.D.C.1996).

of its residents are Medicare recipients. Plaintiff maintained that injunctive relief was necessary because of the risk of "transfer trauma" to its residents. Plaintiff contended that:

When an elderly resident of a nursing home (or any stable environment) is transferred to a new, unfamiliar environment and particularly when the transfer is involuntary, he or she may experience 'transfer trauma.' . . . [T]here is a great risk of emotional trauma and impairment of patient function and condition if transfers are forced.

(Plaintiff's Memorandum at 23.) Plaintiff provided numerous affidavits from the families of its residents stating that Greenbelt is a safe environment, and that a transfer would be a traumatic event for their loved ones.

Plaintiff further argued that the Defendants would not suffer any harm if the injunctive relief was granted because the Temporary Manager and Federal Monitor were in place to remedy the facility's deficiencies. Plaintiff also maintained that Secretary Shalala decision to terminate its participation was thwarting the efforts of this Court to remedy the deficiencies in this manner. Plaintiff contended that the Consent Order was "consistent with the Temporary Management process envisioned by the Social Security Act, and will lead to improving and maintaining the quality of care provided to Greenbelt's residents." Plaintiff's Memorandum at 35.

On December 9, 1998, the Court held an expedited hearing on Plaintiff's Motion for a Temporary Restraining Order. At the hearing, United States Attorney's Office recused itself from representing the Federal Government in the instant case because of its involvement in the first case. That Office was a signatory to the Consent Order, and was responsible for the hiring of the Temporary Manager and the Federal Monitor.

The Court heard arguments from counsel for Greenbelt, Secretary Shalala, and for the State. The Court also allowed in the limited testimony of the Temporary Manager, Warner, on behalf of the Plaintiff, and Gloria Speller, a federal surveyor, and Carol Benner, Director of the LCA, on behalf of the Defendants. In addition, the Court called the Federal Monitor, Schlosberg.

Warner testified about the improvements that she was implementing at Greenbelt, including a weekly team to check resident's wound, and improvement in such areas as restraint reduction and restorative nursing. She testified that because she began working at the facility in early October, she had only six weeks to make these improvements before the survey teams visited. In an affidavit submitted to the Court prior to the hearing, Warner stated, "[i]f the result of the survey process is termination, I will not be able to fulfill the Federal Court's mandate, especially when I do not believe the findings of the federal and state surveyors described by the teams support closure of Greenbelt and the transfer of its residents." Warner's Aff. at 4.

Speller, who was the lead surveyor on the November 30–December 4 federal survey team, testified about numerous deficiencies that the team had noted during their visit. These deficiencies included evidence of mice and mice droppings, dirty rooms, inappropriate wound care treatment, amongst other things.

Benner testified that the State has an efficient plan under which the residents could be moved without suffering from "transfer trauma." Benner stated that LCA had closed nine nursing homes, and had moved approximately two thousand residents. Benner contended that the only incident of potential harm after such a move was that of an elderly woman who died the day after she was moved. Benner maintained, however, that there was no proof that this death was attributable to the move. Benner also testified that she believed that there would be a greater risk for the residents to remain in Greenbelt

based on the latest survey findings than there would be to move them.

Schlosberg testified that it was her general impression that Greenbelt was acting in good faith, and was working hard to address its problems. She stated that the facility had a caring staff which was attempting to be honest about the deficiencies that existed at the facility. Schlosberg contended that Greenbelt had not had enough time to adequately address these concerns. She testified that continued participation in the Medicare and Medicaid programs was necessary to fulfill the mandate of the Consent Order.

In its brief and at the hearing, the Federal Government first argued that the Court lacked jurisdiction to hear this case because the Plaintiff has not exhausted its remedies as Plaintiff is currently seeking administrative review of HCFA's decision to terminate. The Federal Government argued that Plaintiff was not seeking to maintain the status quo. The Federal Government contended that the Plaintiff has not received any benefits from the Federal Government since it was terminated from the program on September 26, 1998. Further, the Federal Government argued that the facts that Plaintiff had not sought expedited review before the administrative law judge and had not asked for this temporary restraining order until three months later reveal that this injunctive relief is not needed immediately, and that there is no threat of irreparable harm. In addition, the Federal Government contended that the harm to itself asserted by the Plaintiff is "merely financial—and plaintiff has not even attempted to show that either it or its parent company could not possibly sustain plaintiff while its administrative appeals are decided." Federal Government's Opposition at 3.

Moreover, the Federal Government contended that Plaintiff was not likely to succeed on the merits of its claim because it argued that the Secretary had authority to terminate its participation absent a finding of immediate jeopardy. Further, the Fed-

eral Government argued that the Secretary did not have the statutory authority to continue payments past the six month period described in Section 1395i–3(h)(2)(C). The Federal Government contended that the Secretary could only allow payments to July, which was six months after the initial January survey which found deficiencies. The Federal Government argued that although Plaintiff claims that it was in compliance in July, further investigation displayed that Greenbelt had made misrepresentations to the agencies and that it was not in substantial compliance at that time. Therefore, Defendant argued that the Court cannot compel the Secretary to reinstate Greenbelt because the Secretary does not have the statutory authority to continue making payments to Greenbelt.

The State has argued that the Court lacks subject matter jurisdiction over it because of the Eleventh Amendment to the United States Constitution, and the doctrine of sovereign immunity. The State also contended that the Eleventh Amendment would bar an order to continue payments to Greenbelt because it states that it has not violated federal law. According to the State, "[w]ithout HCFA assurances that the federal government will pay the federal share, the State is under no continuing obligation to pay for services." Opposition of the State at 13.

Both of the Defendants have argued that the resurveys conducted by a State survey team in mid-November and by a Federal survey team in the first week of December revealed that not only was Greenbelt not in substantial compliance with the regulations, but, in fact, deficiencies found were worse than they had been in the original survey in January. Both maintained that the risk of transfer trauma to Greenbelt residents is a lesser risk of harm to them than that of remaining in the facility. Therefore, they contended that Greenbelt cannot meet the standards for issuing injunctive relief.

## III

*Jurisdiction*

Before turning to the merits of Plaintiff's Motion for Temporary Restraining Order, this Court first must determine whether the Court has subject matter jurisdiction. Plaintiff has asserted that the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1361, and 42 U.S.C. § 405(g). Defendants maintain that the Court does not have jurisdiction because it has not exhausted its administrative remedies as it is required to by pursuant to 42 U.S.C. § 405(g) and (h), as incorporated into the Medicare statute by Section 1395ii. Plaintiff contends its claims represent a collateral attack on the Secretary's decision to terminate and therefore exhaustion is not required.

■■■ "The Supreme Court has recognized that 'cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate .' ... [T]o be excused from the exhaustion requirement, Plaintiff must show that: (1) the suit involves a collateral attack rather than one on the merits; and (2) its interest in prompt judicial review is so compelling that deference to the agency's determination is inappropriate." *Lake County Rehabilitation Center, Inc. v. Shalala*, 854 F.Supp. 1329, 1335–36 (N.D.Ind. 1994) (citations omitted). This Court finds that Plaintiff has met these requirements. Plaintiff's claims do not require the Court to address the substance of the Secretary's decision. The Court is not asked to evaluate HCFA factual findings as to the deficiencies, or whether Greenbelt was actually out of compliance with the regulations. Rather, Plaintiff claims are a collateral attack addressing the scope of the Secretary's power under the Medicare Act. Furthermore, Plaintiff has argued that without funding, it will have to close. This is a showing that its interest in prompt judicial review is compelling. Therefore, the Court finds that Plaintiff has met the re-quirements for waiver of the exhaustion requirement, and that the Court has jurisdiction to hear the claims made against the Federal Government.

■■■ The State has also argued that the Court lacks jurisdiction to hear this case. The State maintains that "[a]ny order directing the Secretary of the Department to pay for the continued operation of Greenbelt would be an order against the State of Maryland." State's Opposition at 9–10. Further, the State argues that it has not consented to be sued, and Congress has not clearly and unequivocally expressed an intent to abrogate its sovereign immunity in the Medicaid statute. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The State notes that Congress repealed a statutory provision that expressly required the states to waive any Eleventh Amendment immunity, and argues that "[n]o more compelling evidence could demonstrate the lack of congressional intent to abrogate sovereign immunity." Opposition of the State at 11. The State also argues that the Supreme Court held in *Seminole* that Congress's Article I powers "cannot be used to circumvent the Constitutional limitations placed on federal jurisdiction." *Id.* at 72, 116 S.Ct. 1114. As the Medicaid Act was enacted under Congress's Article I spending powers, the State argues that Congress did not have the power to abrogate its immunity.

Plaintiff has argued that the doctrine of sovereign immunity and Eleventh Amendment concerns are not implicated in this case, because although it is seeking money from the State treasury in terms of continued payments, it is not seeking money damages. Plaintiff argues that the Court does have jurisdiction over the State because the State is a joint participant in the Medicaid program, which is established under federal law. Plaintiff states that an individual has a right to pursue injunctive relief against a state official to ensure that the official is complying with federal law. *See id.* at 71 n. 14, 72 n. 16, 116 S.Ct. 1114.

Finally, Plaintiff notes that the Supreme Court stated in *Wilder v. Virginia Hospital Ass'n,* that the repeal of the waiver provision in the Medicaid Act was not to " 'be construed as in any way contravening or constraining the rights of the providers of Medicaid services, the State Medicaid agencies, or the Department to seek prospective, injunctive relief in a federal or state judicial forum.' " 496 U.S. 498, 517, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (citing S.Rep. No. 94–1240, Reprinted in 1976 USCCAN at 5651).

The Court finds that it has jurisdiction to hear Plaintiff's claims because it is seeking prospective injunctive relief. The Court believes, however, that the State's obligation to make Medicare payments is derivative. *See* 42 C.F.R. §§ 488.450(d), 488.452(e); COMAR 10.910.29 Therefore, if the Court finds that the Federal Government cannot be compelled to reinstate the payments, the Court will also find that the State cannot be so compelled.

## IV

*Standards for Injunctive Relief*

The standards for injunctive relief in the Fourth Circuit are well known. In *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manuf. Co., Inc.,* 550 F.2d 189 (4th Cir.1977), the Fourth Circuit explained that the most important factors a district court must consider in deciding whether to grant injunctive relief are the threat of irreparable harm to the plaintiff should the Court not issue an injunction, and the likely harm to the defendant if an injunction is ordered. *See id.* at 196. The district court's first task is to balance these two factors. *See Manning v. Hunt,* 119 F.3d 254, 263 (4th Cir.1997). After doing this balancing, the court may then consider the third factor, which is the plaintiff's likelihood of success. *See id.* As the balance of harm moves in favor the defendant, the plaintiff has a greater burden in showing its likelihood of success. *See id.* Finally, the Court considers the fourth factor, the public interest. *See id.*

## V

*Analysis*

■ The balance of the hardships seems to be in Plaintiff's favor. If Plaintiff does not receive the monies from the Federal and State agencies there is a real possibility of irreparable harm: the facility may have to close. The Federal Government has argued that Plaintiff has not shown that it does not have the financial ability to remain open without the funding. However, as 90% of its residents receive Medicaid benefits, it is reasonable to assume that the cessation of payments will result in closure of the facility. Furthermore, all of the parties have acknowledged that there is a risk that the facility's residents will suffer "transfer trauma" resulting in severe psychological, emotional, and physical damage due to this closure.

The possibility of harm to the Defendants is not as great. Both agencies have argued that residents might suffer more harm if they remain in Greenbelt than if they were removed from the facility. None of the deficiencies, however, found by the surveyors have met the level in which they would be categorized as immediately jeopardizing the health or safety of Greenbelt's residents. Therefore, although the Defendants may have a generalized concern about the welfare of the residents, they have not shown a likelihood of harm to them if the injunction is ordered.

■ The Court now considers the third factor in the hardship balancing test: plaintiff's likelihood of success on the merits. When "the balance [of the hardships] 'tips decidedly' in favor of the plaintiff ... a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' " *Rum Creek Coal Sales. Inc. v. Caperton,* 926 F.2d 353, 359 (4th

Cir.1991) (citing *Blackwelder,* 550 F.2d at 195). Plaintiff has not done so in the instant case.

■ Plaintiff challenges the Secretary Shalala's authority under the Medicare Act to terminate the facility's participation in the Medicare program. The statutory provisions, found at 42 U.S.C. § 1395(I)–3(h), which delineate the powers of the Secretary in this matter state:

(1) In general

If a State finds, on the basis of a standard, extended, or partial extended survey under subsection (g)(2) of this section or otherwise, that a skilled nursing facility no longer meets a requirement of subsection (b), (c), or (d) of this section, and further finds that the facility's deficiencies—

(A) immediately jeopardize the health or safety of its residents, the State shall recommend to the Secretary that the Secretary take such action as described in paragraph (2)(A)(I); or

(B) do not immediately jeopardize the health or safety of its residents, the State may recommend to the Secretary that the Secretary take such action as described in paragraph (2)(A)(ii).

If a State finds that a skilled nursing facility meets the requirements of subsections (b), (c), and (d) of this section, but, as of a previous period, did not meet such requirements, the State may recommend a civil money penalty under paragraph (2)(B)(ii) for the days in which it finds that the facility was not in compliance with such requirements.

(2) Secretarial authority

(A) In general

With respect to any skilled nursing facility in a State, if the Secretary finds, or pursuant to a recommendation of the State under paragraph (1) finds, that a skilled nursing facility no longer meets a requirement of subsection (b), (c), (d), or (e) of this section, and further finds that the facility's deficiencies—

(I) immediately jeopardize the health or safety of its residents, the Secretary shall take immediate action to remove the jeopardy and correct the deficiencies through the remedy specified in subparagraph (B)(iii), or terminate the facility's participation under this subchapter and may provide, in addition, for one or more of the other remedies described in subparagraph (B); or

(ii) do not immediately jeopardize the health or safety of its residents, the Secretary may impose any of the remedies described in subparagraph (B).

Nothing in this subparagraph shall be construed as restricting the remedies available to the Secretary to remedy a skilled nursing facility's deficiencies. If the Secretary finds, or pursuant to the recommendation of the State under paragraph (1) finds, that a skilled nursing facility meets such requirements but, as of a previous period, did not meet such requirements, the Secretary may provide for a civil money penalty under subparagraph (B)(ii) for the days on which he finds that the facility was not in compliance with such requirements.

(B) Specified remedies

The Secretary may take the following actions with respect to a finding that a facility has not met an applicable requirement:

(I) Denial of payment

The Secretary may deny any further payments under this subchapter with respect to all individuals entitled to benefits under this subchapter in the facility or with respect to such individuals admitted to the facility after the effective date of the finding.

(ii) Authority with respect to civil money penalties

The Secretary may impose a civil money penalty in an amount not to ex-

ceed $10,000 for each day of noncompliance. The provisions of section 1320a–7a of this title (other than subsections (a) and (b)) shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1320a–7a(a) of this title.

(iii) Appointment of temporary management

In consultation with the State, the Secretary may appoint temporary management to oversee the operation of the facility and to assure the health and safety of the facility's residents, where there is a need for temporary management while—

(I) there is an orderly closure of the facility, or

(II) improvements are made in order to bring the facility into compliance with all the requirements of subsections (b), (c), and (d) of this section.

The temporary management under this clause shall not be terminated under subclause (II) until the Secretary has determined that the facility has the management capability to ensure continued compliance with all the requirements of subsections (b), (c), and (d).

The Secretary shall specify criteria, as to when and how each of such remedies is to be applied, the amounts of any fines, and the severity of each of these remedies, to be used in the imposition of such remedies. Such criteria shall be designed so as to minimize the time between the identification of violations and final imposition of the remedies and shall provide for the imposition of incrementally more severe fines for repeated or uncorrected deficiencies. In addition, the Secretary may provide for other specified remedies, such as directed plans of correction.

(C) Continuation of payments pending remediation

The Secretary may continue payments, over a period of not longer than 6 months after the effective date of the findings, under this subchapter with respect to a skilled nursing facility not in compliance with a requirement of subsection (b), (c), or (d) of this section, if—

(I) the State survey agency finds that it is more appropriate to take alternative action to assure compliance of the facility with the requirements than to terminate the certification of the facility,

(ii) the State has submitted a plan and timetable for corrective action to the Secretary for approval and the Secretary approves the plan of corrective action, and

(iii) the facility agrees to repay to the Federal Government payments received under this subparagraph if the corrective action is not taken in accordance with the approved plan and timetable.

The Secretary shall establish guidelines for approval of corrective actions requested by States under this subparagraph.

(D) Assuring prompt compliance

If a skilled nursing facility has not complied with any of the requirements of subsections (b), (c), and (d) of this section, within 3 months after the date the facility is found to be out of compliance with such requirements, the Secretary shall impose the remedy described in subparagraph (B)(I) for all individuals who are admitted to the facility after such date.

Plaintiff contends that these provisions establish that the Secretary can only terminate a facility's participation under the Medicare program when there has been a finding that the deficiencies cited immediately jeopardize the health and safety of its residents. The Secretary, however, has adopted regulations which provide that HCFA or the State may terminate a facility's provider agreement absent a finding of immediate jeopardy. *See* 42 C.F.R. § 488.412, 488.456.

■ The Medicaid provisions mostly parallel Medicare provisions. However, as Medicaid is a joint program, the Medicaid Act also address the authority of the State to remedy deficiencies. Under 42 U.S.C. § 1396r(h):

(1) In general

If a State finds, on the basis of a standard, extended, or partial extended survey under subsection (g)(2) of this section or otherwise, that a nursing facility no longer meets a requirement of subsection (b), (c), or (d) of this section, and further finds that the facility's deficiencies—

(A) immediately jeopardize the health or safety of its residents, the State shall take immediate action to remove the jeopardy and correct the deficiencies through the remedy specified in paragraph (2)(A)(iii), or terminate the facility's participation under the State plan and may provide, in addition, for one or more of the other remedies described in paragraph (2); or

(B) do not immediately jeopardize the health or safety of its residents, the State may—

(I) terminate the facility's participation under the State plan,

(ii) provide for one or more of the remedies described in paragraph (2), or

(iii) do both. . . .

Therefore, it is clear that the State has the authority to terminate the facility participation even absent a finding of immediate jeopardy. Plaintiff, however is not directly challenging the State's authority to terminate participation, but that of the Secretary of HHS. Ultimately, the issue before the Court is one of statutory interpretation.[3]

Four courts have looked at this issue while deciding whether to grant injunctive relief. One court declined to reach the issue because it found that the facts in that case indicated that the plaintiff was likely to be reinstated. *See Libbie Rehabilitation Center, Inc. v. Shalala*, 26 F.Supp.2d 128 (D.D.C.1998). Two of those courts found that the Secretary was acting outside of the statutory authority granted to her because they held that the statute only allowed the Secretary to terminate a facility from the programs when there had been a finding of immediate jeopardy. *See Mountainview Nursing and Rehabilitation Center, Inc. v. Department of Health and Human Services*, No. 93 CV 1692 (M.D.Pa. Nov. 18, 1993); *Claridge House, Inc. v. Department of Health and Human Services*, 795 F.Supp. 1393 (S.D.Ohio 1991). One court has found that the Secretary has the authority to terminate absent such a finding. *Lake County*, 854 F.Supp. at 1340. The Court believes that this latter court reached the correct result.

Although the *Claridge House* court found that "if the Secretary could terminate a facility with or without a finding of immediate jeopardy, there would be little point in distinguishing . . . between situations of immediate jeopardy and situations of no immediate jeopardy," an examination of the statutory language reveals the purpose for the distinction. 795 F.Supp. at 1404. As the *Lake County* court has noted, if the Secretary finds a facility's deficiencies rise to the level of immediately jeopardizing its resident's health, Congress has mandated that the Secretary "shall" either terminate the facilities participation or appoint a temporary manager. *See* 854 F.Supp. at 1340. The only discretion that the Secretary has in this situation is which of the two avenues offered by Congress to pursue under the given circumstances. If

---

**3.** Plaintiff's challenge in this case is primarily to the Secretary's decision to terminate its participation in the Medicare program. Although this decision necessarily had an impact on Plaintiff's participation in the Medicaid program, the HCFA did not reference the

Medicaid act in its letter to Plaintiff. Therefore, the Court must determine whether the Secretary had the statutory authority to terminate under the Medicare provisions found in Section 1395i–3(h).

the deficiencies do not rise to this severe level, however, the Secretary "may" choose from the three remedies specified in Section 1395i–3(h)(2)(B). The statutory language does not require the Secretary to choose one of these remedies. Instead, the provision clearly states that "[n]othing in this subparagraph shall be construed as restricting the remedies available to the Secretary to remedy a skilled nursing facilities deficiencies." Section 1395i–3(h)(2)(A).

Although courts have disagreed on the interpretation of Section 1395i–3(h), this Court finds this reading to be the most in line with Congress' intent as expressed in the legislative history. Prior to 1987, HCFA could only either terminate a facility's participation or deny payments if that facility was found to not be in substantial compliance with the Medicare or Medicaid participation requirements. In 1987, however, Congress amended the Social Security Act to include the intermediate remedies such as the denial of payments for future residents, the imposition of civil penalties, and the appointment of a temporary manager. "[T]here is no indication in the legislative history of the statute that Congress wished to limit the Secretary's ability to terminate a facility from participation in the Medicare program." *Lake County*, 854 F.Supp. at 1340. Rather, the Committee reports indicate that Congress intended to expand the remedies available. *See* H.R.Rep. No. 291(I), 100th Congress, 1st Sess., Reprinted in 1987 USCCAN 2313–1, 2313–295.

The legislative history supports an interpretation that the distinction drawn between deficiencies which immediately jeopardize the health and safety of the facility's residents and those that do not was not based on the Secretary's authority to terminate a facility's participation. The Committee report states that if the "deficiencies immediately jeopardize the health and safety of its residents, the Secretary would be *required* to follow one of two courses of action." *Id.* (emphasis added). On the other hand, the Committee stated, if the deficiencies did not rise to that level, " the Secretary *could, in addition to any other remedies available to the Secretary under law,* exercise one or more of three specified intermediate remedies." *Id.*

Under 42 U.S.C. § 1395cc(b)(2), "[t]he Secretary may ... refuse to renew or may terminate such an agreement after the Secretary—(A) has determined that the provider fails to comply substantially with the provisions of the agreement, with the provisions of this subchapter and regulations thereunder ..." This provision, which does not require a finding of immediate jeopardy, was a remedy available to the Secretary at the time the statute was amended. Therefore, it is clear that the Secretary has the statutory authority to terminate a facility's participation even absent a finding of immediate jeopardy, and the regulations which so state are consistent with the statutory provisions. Thus, Plaintiff is unlikely to succeed on the merits of its claim.[4]

4. The Federal Government also argued that not only does the Secretary have the authority to terminate the provider agreement at any time that a facility is found not to be in substantial compliance with the participation requirements, 42 U.S.C. § 1395 requires the Secretary to terminate the provider agreement if the facility is not found to be in compliance after six months. *See* 42 C.F.R. § 488.412 ("HCFA terminates the provider agreement for SNF's and NF's ... for a NF for which participation was continued under paragraph (a) of this section, if the facility is not in substantial compliance within 6 months of the last day of the survey."); *see*

*also* 42 C.F.R. § 488.450(d). Plaintiff argued that it had been recertified within this six month period. Plaintiff maintained that "[w]ith the acceptance of the plan of correction by HCFA, the survey cycle would end (until the next survey by the LCA or a federal survey agency) and the facility would be entitled to the intervening period to continue its corrective measures." Plaintiff's Memorandum at 15. Plaintiff relied on LCA's July 29, 1988 letter stating that it would consider the facility to be in compliance and ¶ 23 of the Complaint in the first case, which states that HCFA accepted the plan of correction in its argument that it was certified as of July 26,

The Court believes that the public interest would be served if the facility was allowed to correct its deficiencies within the time frame allotted by the Consent Order approved by this Court. Although the balance of the other factors of the hardship balancing test might be in Plaintiff's favor, the Court cannot grant this extraordinary relief in light of the fact that Plaintiff is not likely to succeed on the merits of its complaint.

■■ Nor can the Court find any equitable reasons to reach a different result. The doctrine of estoppel, under which HCFA could be bound by September 15 Consent Order is inapplicable. "[E]stoppel is rarely if ever, [invoked] against the Government absent proof of some affirma-

tive misconduct by a Government agent." *United States v. Vanhorn,* 20 F.3d 104, 112 n. 9 (4th Cir.1994). That has not been shown in this case.

As discussed in footnote 4, *supra,* the United States Attorney Office is not an agent of HCFA, and HCFA was not a signatory party of the Consent Order. Plaintiff maintains that "in light of the entry of the Consent Order imposing the federal operation of the facility under the temporary Manager and Monitor only days after HCFA issued its termination notice, Greenbelt had every reason to believe that this comprehensive remediation of the problems at the facility would enable it to maintain its status in the federal and state entitlement programs." Plaintiff's Reply at 4. Nothing, however, indi-

1998. HCFA argued, however, that it ever accepted the plan of correction because the August survey occurred before HCFA acted on LCA's recommendations. *See* Federal Government's Opposition at 5.

Although LCA could recommend that Greenbelt be considered in compliance, LCA did not have the power to bind HCFA to that recommendation. *See* 42 U.S.C. § 1396r (h)(6)(B) ("If the Secretary finds that a nursing facility has not met all the requirements of subsections (b), (c), and (d) of this section, and that the failure does not immediately jeopardize the health or safety of its residents, but the State has not made such a finding, the Secretary ... may impose any remedies specified in paragraph (3)(C) with respect to the facility ...") Moreover, the United States Attorney Office, not HCFA, was the signatory to the Consent Order. The United States Attorney Office also cannot be seen as an agent of HCFA. Nothing indicates that an agent from HCFA ever represented to Greenbelt that it was considered to be in compliance in July. Therefore, Plaintiff's argument that a new cycle had begun must fail.

Plaintiff further argued that even if the six month time period had elapsed, despite 42 C.F.R. § 488.412, HCFA is not required to terminate a facility's participation by 42 U.S.C. § 1395i(h)(3)(C). Section 1395i–3(h)(2)(C) does not expressly mention termination. The provision merely states that the Secretary can continue payments for a six month period. Nothing in this language indicates that Secretary could not simply deny payments, instead of terminating the facility's participation in the program, after this six month period. Denial of payments, however,

would probably lead to the same result in this case as termination. Under 42 U.S.C. § 1396r (h)(1)(B), the State could terminate the facility's participation without a finding of immediate jeopardy. Thus, even if HCFA had merely denied funding, the State would not have been under any legal obligation to continue paying Greenbelt for the services rendered to its residents on Medicaid.

Plaintiff argued, however, HCFA had the authority to continue payments beyond the six month period. Plaintiff maintained that a "review of the statutory provisions and legislative history creating intermediate remedies such as temporary management generally and the particular invocation of that remedy in this case, demonstrate the inaccuracy" of HCFA's position that it cannot continue payments. Plaintiff's Reply at 7. Plaintiff claimed that the temporary management provision would be rendered meaningless if HCFA is required to cease funding at the end of six months because no such time limit is imposed in that provision. A Temporary Manager may need more than six months to get the facility into compliance, and the cessation of funding during that time period would hinder the Temporary Manager's progress. The Court agrees that a reasonable interpretation of Section 1395i–3(h)(2)(C) in conjunction with Section 1395i–3(h)(B)(iii) would be that the Secretary can continue funding past six month to a facility if the temporary management alternative is employed. However, as the Court finds that HCFA did not choose to use this intermediate remedy, the Secretary was not required to fund beyond the six months period detailed in Section 1395i–3(h)(2)(C).

cates that an agent from HCFA ever represented to Greenbelt that HCFA was not going to terminate it on September 26, 1998, as it was informed it would be by the September 11, 1998 letter. Further, the language of the Consent Order clearly states that all administrative remedies were not supplanted by its terms. Therefore, there is not any evidence of affirmative misconduct on the part of a HCFA agent, and estoppel cannot apply.

Although the Court is compelled to reach the conclusion that Secretary Shalala through HCFA had the authority to terminate Greenbelt's participation in the Medicare program, the Court wishes to express its concerns about the fairness of this action. The Court believes that this is an inequitable result. From all indications, Greenbelt entered into the Consent Order in good faith. The Temporary Manager and the Federal Monitor have just recently begun the work necessary to correct the deficiencies cited by the respective agencies. Although the agencies argue that the conditions at Greenbelt have become worse, not better, since January, the Court believes that the Temporary Manager has not had sufficient time to address the problems. The Federal Monitor has taken the position that "[e]ffectuation of the termination virtually shuts down the facility only weeks after the temporary manager's appointment, compelling the involuntary discharge of all the residents and shutting down the remedial process put in place by the court's order .[She] firmly believes that facility closure is not in the best interests of Greenbelt's residents ...." December 9, 1998 Letter from Federal Monitor Claudia Schlosberg at 2. The Court is inclined to agree.

Plaintiff has argued that "Greenbelt and its residents are caught in a conflict between competing Governmental objectives which they cannot control." Plaintiff's Memorandum at 39. The Court agrees with this proposition. This conflict was displayed by the fact that the United States Attorney was compelled to recuse herself from this case.

Unfortunately for Greenbelt, however, the Court does not agree with the proposition that "[t]he notion that somehow there is a 'different' United States or federal involved in this action than the agency involved in the related case is an absurdity ...." Plaintiffs Reply at 9. It is clear that two different arms of the Federal Government, with two different views on how Greenbelt's programs should be addressed, were involved in these cases. As HCFA had the authority to terminate, and the Office of the Attorney General did not have the power to bind HCFA to the provisions of the Consent Order, Plaintiff cannot receive its requested relief.

Therefore, the Court will deny Plaintiff's Motion for a Temporary Restraining Order, without prejudice to the Plaintiff's seeking a hearing on its Motion for a Preliminary Injunction, after it has exhausted its administrative remedies, or at another time should any circumstance arise which would warrant that relief.